RMT:ICR/AFM/KCB
F.#2018R01047

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

JACK CABASSO,
FRANCES CABASSO,
JONATHAN LASKER,
CHRISTINE LAVONNE LAZARUS,
WAYNE MARINO,
EDUARD MATULIK,
ALAN SCHWARTZ and
AVENTURA TECHNOLOGIES, INC.

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

Case No. 19-MJ-1035

**COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANTS AND
A SUMMONS**

(18 U.S.C. §§ 545, 1349, 1956 and 2)

EASTERN DISTRICT OF NEW YORK, SS:

      CLAUDIO LIPCIC, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting

as such.

<u>CONSPIRACY TO COMMIT WIRE FRAUD AND MAIL FRAUD</u>
(The Country-of-Origin Scheme)

      In or about and between August 1, 2006 and November 2019, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JACK CABASSO, FRANCES CABASSO, JONATHAN LASKER,

CHRISTINE LAVONNE LAZARUS, WAYNE MARINO, EDUARD MATULIK, ALAN

SCHWARTZ and AVENTURA TECHNOLOGIES, INC., together with others, did

knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more

persons, to wit: U.S. government agencies, contractors and private-sector customers, and to

obtain money and property from them by means of one or more materially false and

fraudulent pretenses, representations and promises, to wit: falsely stating merchandise was

made in the United States and falsely stating merchandise was made by AVENTURA

TECHNOLOGIES, INC., and for the purpose of executing such scheme and artifice, (a) to

transmit and cause to be transmitted, by means of wire communication in interstate

commerce, writings, signs, signals and sounds, to wit: electronic messages and telephone

communications, contrary to Title 18, United States Code, Section 1343; and (b) to place and

cause to be placed in a post office and authorized depository for mail matter, and cause to be

sent and delivered by the United States Postal Service and private commercial carriers, one

or more matters and things, to wit: shipments of merchandise, contrary to Title 18, United

States Code, Section 1341.

(Title 18, United States Code, Section 1349)

<u>CONSPIRACY TO COMMIT WIRE FRAUD AND MAIL FRAUD</u>
(The Woman-Owned Small Business Scheme)

In or about and between August 1, 2006 and November 2019, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JACK CABASSO, FRANCES CABASSO, JONATHAN LASKER,

CHRISTINE LAVONNE LAZARUS and AVENTURA TECHNOLOGIES, INC., together

with others, did knowingly and intentionally conspire to devise a scheme and artifice to

defraud one or more persons, to wit: U.S. government agencies, and to obtain money and

property from them by means of one or more materially false and fraudulent pretenses,

representations and promises, to wit: falsely representing that AVENTURA

TECHNOLOGIES, INC. was a woman-owned business, and for the purpose of executing

such scheme and artifice, (a) to transmit and cause to be transmitted, by means of wire

communication in interstate commerce, writings, signs, signals and sounds, to wit: electronic

messages, contrary to Title 18, United States Code, Section 1343; and (b) to place and cause

to be placed in a post office and authorized depository for mail matter, and cause to be sent

and delivered by the United States Postal Service and private commercial carriers, one or

more matters and things, to wit: shipments of merchandise, contrary to Title 18, United

States Code, Section 1341.

(Title 18, United States Code, Section 1349)

UNLAWFUL IMPORTATION

In or about and between August 1, 2006 and November 2019, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JACK CABASSO, FRANCES CABASSO, JONATHAN LASKER,

CHRISTINE LAVONNE LAZARUS, WAYNE MARINO, EDUARD MATULIK, ALAN

SCHWARTZ and AVENTURA TECHNOLOGIES, INC., together with others, did

knowingly, intentionally and fraudulently import and bring into the United States

merchandise contrary to law, and did receive, conceal, buy, sell and facilitate the

transportation, concealment and sale of such merchandise after importation, knowing such

merchandise to have been imported and brought into the United States contrary to law, to

wit: security cameras and other networked surveillance cameras, automated turnstiles, and

related equipment, in violation of Title 19, United States Code, Section 1304 (requiring that

every article of foreign origin imported into the United States, unless exempted by law, to be

conspicuously marked to display to the ultimate purchaser in the United States the English name of the country of origin of the article), and its implementing regulations, including 19 C.F.R. § 134.46 (requiring that such articles, where "the words 'United States,' or 'American,' the letters 'U.S.A.,'" or variations thereof appear on, and where those "letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article," contain "legibl[e]" and "permanent[]" markings of such articles with "the name of the country of origin preceded by 'Made in,' 'Product of,' or other words of similar meaning").

(Title 18, United States Code, Sections 545 and 2)

MONEY LAUNDERING CONSPIRACY

In or about and between July 2010 and November 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JACK CABASSO and FRANCES CABASSO, together with others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, to wit: wire fraud and mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Sections 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2012.   I have been involved in the investigation of numerous cases involving counterintelligence, export control investigations and money laundering.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.   All statements in this affidavit attributed to any person are set forth in sum, substance and in part.

I.   The Defendants

2.      AVENTURA TECHNOLOGIES, INC. ("AVENTURA") is a closely held Commack, Long Island-based company, formed in December 2000 under the laws of Delaware, that is purportedly 97% owned by FRANCES CABASSO.   AVENTURA markets itself as a manufacturer of security equipment, including network-linked security cameras and walk-through metal detectors.   AVENTURA's largest customers are U.S. government agencies, including the U.S. Army, U.S. Navy and U.S. Air Force.   As part of this investigation, the government has obtained copies of over 60 different contracts between AVENTURA and U.S. government agencies.   However, AVENTURA also sells to private-

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause, I have not described all the relevant facts and circumstances of which I am aware.

sector customers in the United States and abroad, some of whom are contractors for government agencies.

3.      Since August 1, 2006, AVENTURA has held U.S. General Services Administration ("GSA") Multiple Award Schedule ("GSA Schedule") contracts, which as discussed below, permit federal government agencies to obtain volume discount pricing for equipment sold by the contract-holder.   AVENTURA has reported to GSA that, through December 31, 2018, it has sold approximately $20.7 million of security equipment to U.S. government agencies through its GSA Schedule contracts.   In addition to its GSA Schedule contracts, AVENTURA has directly contracted with numerous other federal government agencies.   Among other agencies, the Department of the Treasury has paid AVENTURA approximately $16.9 million through September 9, 2019, on both GSA Schedule and directly contracted purchases.   In total, AVENTURA has been paid approximately $88 million by government and private-sector customers since November 2010.

4.      JACK CABASSO founded AVENTURA and identifies himself as its "Managing Director," but is, in all but name, the chief executive officer and final decision maker at AVENTURA.

5.      FRANCES CABASSO is JACK CABASSO's wife and AVENTURA's purported 97% owner, president, chief executive officer, and highest-paid employee.   In fact, and as detailed below, FRANCES CABASSO works part-time at a Long Island accounting firm and serves as AVENTURA's nominee owner on AVENTURA's bank accounts and corporate records, concealing JACK CABASSO's control over AVENTURA.

6.     CHRISTINE LAVONNE LAZARUS (hereinafter "LAVONNE LAZARUS") has worked at AVENTURA since approximately December 2006 and holds the title of "Director of Business Development."

7.     JONATHAN LASKER has worked at AVENTURA since at least January 2004 and holds the title of "Director of Operations."

8.     ALAN SCHWARTZ was employed at AVENTURA with the title "Systems Engineering Manager" from in or about May 2018 to June 2019, when he retired. From approximately February 2016 to May 2018, SCHWARTZ was employed by the U.S. subsidiary of a security-equipment manufacturer owned by the Government of the People's Republic of China ("PRC") (PRC Manufacturer Subsidiary-1 and PRC Manufacturer-1, respectively).

9.     EDUARD MATULIK has worked at AVENTURA since in or about October 2002 and holds the title of "Director of International Sales."

10.     WAYNE MARINO has worked at AVENTURA since in or about March 2005 and holds the title of "Network Specialist."   MARINO is responsible for information technology management at AVENTURA and is involved in testing products manufactured by other companies that AVENTURA is considering for resale.

II.     Summary of the Scheme

11.     As detailed below, an investigation by the FBI, U.S. General Services Administration Office of the Inspector General ("GSA OIG"), U.S. Department of Defense, Defense Criminal Investigative Service ("DCIS"), U.S. Customs and Border Protection ("CBP"), U.S. Navy Naval Criminal Investigative Service ("NCIS"), U.S. Army Criminal Investigation Command ("Army CID"), U.S. Air Force Office of Special Investigations

("AFOSI"), Internal Revenue Service-Criminal Investigation ("IRS-CI"), Treasury Inspector

General for Tax Administration ("TIGTA"), Treasury Inspector General ("TIG") and

Department of Energy Office of Inspector General ("DOE OIG") has revealed that,

beginning on at least August 1, 2006, and continuing until the present, within the Eastern

District of New York and elsewhere, JACK CABASSO, FRANCES CABASSO, LASKER,

LAZARUS, MARINO, MATULIK, SCHWARTZ and AVENTURA, have conspired with

PRC-based manufacturers of security and surveillance equipment and others, to defraud

AVENTURA's customers, including agencies and contractors of the U.S. government, by

falsely claiming that AVENTURA manufactured its own products, when in fact

AVENTURA imported from, among other countries, the PRC; and to smuggle into the

United States and sell merchandise falsely labeled as made in the United States or lacking

country-of-origin markings required by law.

12.     In furtherance of the conspiracy, the defendants and other

AVENTURA employees have publicly described AVENTURA as a company that

manufactures its products in the United States, and has sold tens of millions of dollars of

surveillance equipment and other products to AVENTURA's U.S. government and private-

sector customers on the strength of AVENTURA's assertions that its products are

manufactured domestically.

13.     However, the government's investigation has revealed that

AVENTURA does not manufacture the products it sells.    Instead, AVENTURA imports its

products from other manufacturers, primarily manufacturers located in the PRC, at times

with false "Made in the U.S.A." labels already affixed to the products or displayed on their

packaging.    AVENTURA has not disclosed that it sells products to the U.S. government that it imports from the PRC.

14.    The products that AVENTURA imports from the PRC (and then resells as its own) include networked security cameras and related equipment manufactured and sold by, among others, PRC Manufacturer-1, and its subsidiaries and affiliates, including PRC Manufacturer Subsidiary-1, and a second PRC manufacturer ("PRC Manufacturer-2").

15.    Security vulnerabilities in the firmware used to operate PRC Manufacturer-1 cameras have been documented by the U.S. Department of Homeland Security, including vulnerabilities that could allow a hacker to remotely assume control of a networked camera and obtain sensitive data.    Similarly, PRC Manufacturer-2's firmware has known security vulnerabilities that, if not patched, would allow a hacker access to data recorded from networked surveillance cameras.

16.    Network-linked surveillance cameras and other security equipment sold by AVENTURA to the U.S. government have been used to safeguard sensitive U.S. government facilities and assets.    Equipment manufactured in the PRC and then sold by AVENTURA as purportedly U.S.-made has been installed on dozens of Army, Navy and Air Force bases, Department of Energy facilities, and among other places, on Navy aircraft carriers.

17.    The government's investigation has further revealed that AVENTURA and its owners and employees, including JACK CABASSO, FRANCES CABASSO, LASKER and LAZARUS, have repeatedly misrepresented AVENTURA to the U.S. government and the public as a woman-owned small business ("WOSB") in order to obtain government set-aside contracts available under U.S. law only to WOSBs.    While

FRANCES CABASSO is listed on nearly all relevant paperwork as the CEO and majority owner of AVENTURA, she plays virtually no role in the operation of the business, which, instead, is entirely controlled by her husband, JACK CABASSO.   JACK CABASSO has described himself as AVENTURA's "Managing Director," and he makes essentially all of the decisions for the business.   However, until approximately January 2019, he was not formally on AVENTURA's payroll as an employee of the business.

18.   Finally, the government's investigation has revealed that JACK CABASSO and FRANCES CABASSO have siphoned millions of dollars out of AVENTURA, including by creating and using several shell entities through which they have transferred monies originally paid by AVENTURA's customers to AVENTURA in exchange for the goods it sells, which are proceeds of AVENTURA's frauds on its government and private-sector customers.

III.   The Scheme to Misrepresent the Country of Origin and the True Manufacturers of Products Sold by AVENTURA

a.   The Role of "Country of Origin" in U.S. Government Procurement

19.   As detailed below, a product's country of origin is an important factor that procurement and contracting officers for the U.S. government consider when deciding to buy it for the use of a U.S. government agency.   The country of origin of government-procured goods has a central place in a statutory and regulatory regime governing the federal government's procurement process that makes it imperative for government procurement officers to understand where their goods are coming from.   That statutory and regulatory regime helps to ensure that products purchased by the U.S. government for public use are not used by foreign-state actors considered adversaries of the United States to compromise the

security of the U.S. government's information technology infrastructure.   Accordingly, misrepresentations regarding the country of origin of goods offered for sale to agencies of the U.S. government affect the process that government procurement officers follow in deciding from which vendors to purchase goods for public use.

20.     The Buy American Act ("BAA") and other purchasing laws generally prohibit U.S. government agencies from purchasing end products for public use that are manufactured outside of the United States, subject to certain limited exceptions.   See generally 41 U.S.C. §§ 8301-8305; 48 C.F.R. § 25.001(a).   The Trade Agreements Act of 1979 ("TAA"), see 19 U.S.C. §§ 2501-2581, authorizes the President to waive this requirement and permits federal agencies to purchase products originating from specifically designated countries that have entered into trade agreements with the United States.   19 U.S.C. § 2511.

21.     Among other things, the TAA and its implementing regulations permit federal agencies to purchase only products that are "wholly the growth, product, or manufacture" of the United States or a TAA-designated country.   The PRC is not a TAA-designated country and has never been so designated.

22.     The GSA is a federal agency that provides centralized procurement services for the federal government.   Under the Multiple Award Schedules ("MAS") Program, the GSA's Federal Acquisition Service establishes long-term, government-wide contracts with commercial vendors to provide procurement officers for federal agencies with a simplified process for acquiring commercial products and services at pre-negotiated volume discount pricing.   Contracts awarded to a contractor under the MAS Program (a

"GSA Schedule" contractor) are referred to variously as "GSA MASs" and "GSA Schedules."   AVENTURA has been a GSA MAS contract-holder since August 1, 2006.

23.   All products offered for sale by GSA Schedule contractors to federal agencies through the MAS Program must comply with the TAA and its implementing regulations, see 19 U.S.C. §§ 2511-2518, and GSA Schedule contractors are required under their contracts to identify to federal agencies the country of origin of each end product they offer for sale pursuant to the GSA Schedule contract.   Under the Federal Acquisition Regulations ("FAR"), which govern procurement for the vast majority of U.S. federal agencies, an end product is manufactured at "the place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government.   If a product is disassembled and reassembled, the place of reassembly is not the place of manufacture."   48 C.F.R. § 52.225-18(a).

24.   As a condition of their contracts, GSA Schedule contractors are also generally required to certify that the products offered for sale to federal agencies comply with the TAA.   See 48 C.F.R. § 25.1101(c) (requiring TAA compliance clauses to be included in procurement contracts); 48 C.F.R. § 52.225-5 (TAA contract clause identifying TAA-designated countries); 48 C.F.R. § 52.225-6 (TAA contract clause requiring contractor to identify the country of origin of each end product); 48 C.F.R. § 52.204-8 (contract clause requiring annual re-certifications of compliance with, among other things, the TAA).

25.   After a contractor is awarded a GSA Schedule contract, the contractor can offer products and services for sale to federal agency procurement officers through a GSA-operated Internet shopping and ordering system known as "GSA Advantage."

Agency procurement officers, however, frequently contact GSA Schedule contractors directly to arrange for the purchase of products and services pursuant to the contractor's GSA Schedule contract.   To purchase products and services against a GSA Schedule contract, procurement officers may issue the contractor a "Task Order" or "Delivery Order," that may, depending on agency-specific procurement regulations, require the contractor to satisfy additional requirements or provide certifications that the contractor may choose to accept with the purchase order.

26.   As discussed above, certain PRC manufacturers, including PRC Manufacturer-1 and PRC Manufacturer-2, produce firmware with known cybersecurity vulnerabilities.   On August 13, 2018, President Trump signed into law the National Defense Authorization Act for Fiscal Year 2019 (the "NDAA").   The NDAA contains a provision prohibiting government agencies, effective August 13, 2019, from procuring PRC Manufacturer-1's video surveillance and telecommunications equipment "[f]or the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes."   See Pub. L. No. 115-232 § 889(a).

   b. *AVENTURA Falsely Represented to U.S. Government Agencies and Other Customers That It Manufactures Its Products in Long Island, New York*

27.   As set forth in detail below, the defendants have (a) sold security equipment and electronics, including network-linked security cameras, to U.S. government agencies; (b) falsely represented to U.S. government agencies that AVENTURA manufactured these products in the United States; and (c) sent and caused to be sent to U.S. government agencies products labeled to reflect that they were made in the United States, when, in fact, they were actually manufactured in the PRC.   By selling PRC-made products

as American-made, the defendants were able to charge far more for the products than if they had truthfully identified them as made in the PRC.

      28.    AVENTURA does little or no manufacturing at its Commack, New York headquarters.   Review of CBP import records indicates that AVENTURA does not import components and raw materials that domestic electronics manufacturers typically import, such as circuit boards or solder.   Bank records further indicate that AVENTURA does not send money to manufacturers of electronic components, whether abroad or in the United States.   Moreover, AVENTURA employs far less labor than it would need in order to manufacture the variety and quantity of products that it claims to produce.   Indeed, AVENTURA reported to its disability insurance carrier that as of July 2018, it employed just 33 individuals, none of whom was identified as involved in manufacturing.

      29.    Law enforcement interviews with former employees of AVENTURA, including an employee who worked for AVENTURA until approximately 2010 ("Individual-1"), and a second employee who worked for AVENTURA until mid-2012 ("Individual-2") have confirmed that AVENTURA has long purchased finished products from the manufacturers in the PRC and fraudulently resold them as its own.   Individual-1 stated, in sum, substance and in part, that during the time Individual-1 worked at AVENTURA, the company did not manufacture any cameras in-house, but instead bought cameras from manufacturers located in the PRC and resold them.   Individual-2 stated, in sum, substance and in part, that AVENTURA's cameras were not assembled in-house, but were instead purchased from other suppliers—often with AVENTURA's name and logo already on the box—and then resold.   Individual-2 specifically identified PRC Manufacturer-1 as a supplier of AVENTURA's Internet-enabled surveillance cameras.

30.     Despite this, AVENTURA has repeatedly represented to the public and the U.S. government that it manufactures its products in the United States.   AVENTURA's website has touted what it describes as "the Aventura Advantage": "Made in U.S.A."   From 2014 to 2016, AVENTURA's annual catalog displayed on its cover a logo bearing the American flag and the words "Made in The USA."   The version of the catalog currently available as of the date of this complaint asserts that AVENTURA "proudly manufacture[s] in the U.S.A."

31.     On or about July 9, 2015, members of IPVM.com, an Internet forum for discussion of network-enabled security cameras, began discussing whether AVENTURA was improperly importing PRC-made goods and branding them as its own.   A user identifying herself as "Lavonne Lazarus," believed to be the defendant LAVONNE LAZARUS, wrote in response:

> Aventura has been located on Long Island, New York in the Hauppauge Industrial Park one of the largest in North America for 15 years. The Company currently has 2 manufacturing, production, logistics and R&D facilities[.] . . . At our facilities we manufacture and assemble our own DVRs, NVRs, Storage Servers, Video Wall Controllers, Switchers, Cameras and Camera Systems, Transmission Equipment in addition to customized hardware and software to customer requirements.

32.     On or about March 3, 2017, LAVONNE LAZARUS posted another comment on IPVM stating: "I am the Director of Business Development of Aventura Technologies and you or anyone else is more than welcome to visit our manufacturing facility any time in New York where our cameras are produced."

33.     On July 1, 2014, AVENTURA's GSA Schedule Contract was extended for a new five-year term (the "2014 Contract Extension").   The 2014 Contract Extension included a certification, purportedly signed by FRANCES CABASSO, stating that each end

product offered for sale under the contract was, as relevant here, "a U.S. made end product [or] a designated country end product" in compliance with the TAA.

      34.     AVENTURA employees have repeatedly told U.S. government procurement officers, orally and in writing, that AVENTURA's products are manufactured in the United States or other TAA-designated countries, while also flagging competitors' purported failures to comply with procurement laws and regulations.   For example:

a.  On or about May 10, 2016, an email was sent from FRANCES CABASSO's email address to a GSA representative, asserting that AVENTURA's products offered for sale through GSA were compliant with the TAA.   A similar letter, signed by FRANCES CABASSO, was sent from JACK CABASSO's email address to a GSA representative on or about March 14, 2018.

b.  On or about November 23, 2016, JACK CABASSO sent an email to a GSA representative accusing 12 other GSA contractors of selling products to the U.S. government that were manufactured by PRC Manufacturer-1.   JACK CABASSO asserted that this was a "big problem," because PRC Manufacturer-1 was "actually the Communist Chinese Government and ha[d] 'significant' cybersecurity issues aside from TAA compliance. . . . So as far as TAA it doesn't get any worse."   JACK CABASSO stated that "[PRC Manufacturer-1] will acknowledge they manufacture no products outside of China."   JACK CABASSO appended a news article about the removal of cameras manufactured by PRC Manufacturer-1 from the U.S. Embassy in Afghanistan.   An excerpt from the email is attached as Exhibit A to this Complaint.

c. On or about March 20, 2019, LAVONNE LAZARUS electronically signed a GSA document certifying, under penalty of perjury, that each of AVENTURA's products complied with the TAA and was made either in the United States or a TAA-designated country.   LAVONNE LAZARUS also certified that AVENTURA would not use facilities located at any address other than its Commack, New York address to fulfil its GSA contract.

c. *AVENTURA Falsely Represented to Private-Sector Customers that it Manufactures its Products in Long Island, New York*

35.   Email communications by AVENTURA employees make plain that AVENTURA's deceptions about the origin of its products are not limited to U.S. government purchasers.   To the contrary, AVENTURA has regularly misled private-sector customers to whom the origin of AVENTURA's products is material.

36.   For example, in and around fall 2018, JACK CABASSO and EDUARD MATULIK exchanged numerous emails with a representative of a company in Qatar ("Distributor-1") who expressed interest in becoming a distributor for multiple lines of AVENTURA security cameras, including models that are manufactured in the PRC.   In November 2018, Distributor-1 emailed JACK CABASSO and MATULIK that Qatar's Ministry of the Interior ("MOI") required Distributor-1 to obtain from AVENTURA a certification that, in Distributor-1's words, "these cameras are made in Aventura's own factory in USA under strict Quality [sic] control."   JACK CABASSO responded: "I believe Ed [MATULIK] confirmed that they are made in the Aventura factory here in New York and MOI or any representative may visit at any time."   JACK CABASSO attached what

purported to be a photograph of AVENTURA's assembly line, depicting a row of seated individuals in blue lab coats and protective hairnets working at laboratory benches.

37.     The photograph that JACK CABASSO attached to his email is not, in fact, a photograph of an AVENTURA manufacturing facility.   A "reverse image search" for that image reveals that the photograph was initially used to illustrate an October 19, 2014 article in Security Electronics and Networks, a trade publication, recounting a reporter's visit to PRC Manufacturer-1's manufacturing facility in Hangzhou, PRC.   As detailed in an excerpt of that article attached as Exhibit B to this Complaint, the photograph is used in the article to show PRC Manufacturer-1's camera manufacturing facility.   The same photograph also appears on the "about us" page of AVENTURA's own website and in numerous promotional materials that AVENTURA and its employees have provided to others, including AVENTURA's 2016 product catalog, an excerpt of which is attached as Exhibit C to this Complaint.

38.     As another example, EDUARD MATULIK corresponded in December 2018 with a prospective Jordanian client ("Client-1") who was seeking to fulfil a Jordanian government tender for walk-through metal detectors.   On or about December 20, 2018, after MATULIK provided laboratory certifications regarding AVENTURA's metal detectors, Client-1 asked MATULIK to specify whether AVENTURA's product was "manufactured in US or manufactured in China and reassembled and rebranded in USA."   MATULIK responded: "USA made."   Client-1 responded seeking clarification: "One main question: if the [metal detector] from Aventura Technologies is made in USA as you mentioned then why all the certifications are from Shenzen China?"   The government's investigation has not revealed, how, if at all, MATULIK responded to this question.

39.     Numerous other communications indicate that the defendants were well aware that AVENTURA's products were made in the PRC and not, as they claimed, in the United States.

40.     For example, on November 14, 2006, a customer emailed JACK CABASSO, copying WAYNE MARINO and EDUARD MATULIK, to relay a discovery: "I got a bit frustrated with the responses I got from Aventura (as in no responses!), so I've searched the internet for solutions.   I found out that the aventura software (and I guess, the hardware as well) is a[n] altered version from the original, supplied by a chinese company called," followed by the name of PRC Manufacturer-4, a PRC-based digital video equipment manufacturer.   The customer asked JACK CABASSO to supply the original, unaltered firmware created by PRC Manufacturer-4, in the hopes that it would be superior to AVENTURA's "buggy" altered version.   MATULIK forwarded this message to JACK CABASSO, writing, "[t]his is proof about our software."

41.     As another example, on or about February 20, 2017, JACK CABASSO used an instant messaging application to send LAVONNE LAZARUS, without comment, a quotation from another instant messaging chat that JACK CABASSO had evidently had with an AVENTURA dealer based in the Middle East.   As quoted, the dealer complained that one of his clients had declined to order AVENTURA products.   According to the dealer, the client had "showed me that AVENTURA product is physically & Software wise same as [PRC Manufacturer-1] Chinese product, then why should we pay 10% high price just to receive equipment from USA."   In a separate chat on that same day, the dealer complained to LAVONNE LAZARUS about AVENTURA's networked video recorders ("NVRs"), stating that AVENTURA's products "looks like [PRC Manufacturer-1] product ... software

is same as [PRC Manufacturer-1]'s NVR . . . [and] sample sent to me . . . have Chinese user manual as well[.]   I informed this issue to Mr. Jack."

42.     On or about October 13, 2016, EDUARD MATULIK sent a message to LAVONNE LAZARUS using an instant messaging application.   "im going to china because I need to know what we are selling and have to source a bunch of stuff," MATULIK wrote.   "jack doesn't have time and we don't know what we are selling anymore."

d.   *AVENTURA Imports Cameras and Other Equipment from the PRC*

43.     As described above, AVENTURA's representations that it manufactures in the United States are false.   In fact, AVENTURA imports finished security equipment from companies in the PRC, including PRC Manufacturer-1 and PRC Manufacturer-2, and then resells them to U.S. government agencies and private-sector customers, while claiming that the goods are manufactured in the United States or other TAA-designated countries.

44.     CBP records, bank records, and the observations of CBP officers inspecting shipments to AVENTURA from the PRC confirm that AVENTURA is a massive importer of finished electronic devices from the PRC.   Hundreds of these imports have arrived in the United States at John F. Kennedy International Airport in Queens, New York ("JFK Airport") as air cargo aboard direct flights from the PRC.   Hundreds more shipments originating in the PRC have been shipped to AVENTURA through JFK Airport after initially arriving at other U.S. ports of entry.

45.     CBP records reflect that between January 6, 2010 and October 25, 2019, approximately 1,550 shipments consigned to AVENTURA have been imported into the United States, of which approximately 964 have been imported from the PRC.   The

same CBP records reflect that AVENTURA has received shipments from over 40 different PRC manufacturers of security equipment.  The table below illustrates the approximate total number of shipments to AVENTURA, which range in size up to thousands of pounds per shipment, from certain PRC manufacturers of security equipment:

| Approximate Total Shipments to AVENTURA From Certain PRC Manufacturers | | |
| --- | --- | --- |
| PRC Manufacturer | Approximate Time Period | Approximate Number of Imports by AVENTURA |
| PRC Manufacturer-1 | January 8, 2010 to April 19, 2018 | 274 |
| PRC Manufacturer-7 | July 15, 2011 to April 30, 2018 | 63 |
| PRC Manufacturer-2 | September 24, 2017 to October 3, 2018 | 9 |
| PRC Manufacturer-6 | August 7, 2010 to July 4, 2013 | 12 |
| PRC Manufacturer-3 | November 23, 2012 to April 26, 2019 | 16 |

46.    These records reveal that these PRC manufacturers are AVENTURA's major business partners.  For example, the customs entries for the PRC Manufacturer-1 shipments to AVENTURA include cargo manifest descriptions of the imported goods that reference "Digital Video Recorder," "DVR," "recorders," "monitors" and other terms associated with security surveillance systems.  Many of the PRC Manufacturer-1 shipments were large, with an average manifested weight of approximately 540 pounds, 45 shipments exceeding 1,000 pounds in weight, and multiple shipments in excess of 6,000 pounds apiece.

47.    AVENTURA's bank records further reveal that AVENTURA has paid at least $12.4 million to PRC-based companies since January 6, 2011.  The table below illustrates the approximate total number and aggregate amounts of payments from AVENTURA to certain PRC manufacturers of security equipment:

| Approximate Total Payments from AVENTURA to Certain PRC Manufacturers | | | |
|---|---|---|---|
| **PRC Manufacturer** | **Approximate Time Period** | **Approximate Number of Payments by AVENTURA** | **Approximate Amount Paid by AVENTURA** |
| PRC Manufacturer-1 | November 1, 2010 to June 12, 2018 | 119 | $6,343,839.15 |
| PRC Manufacturer-7 | January 6, 2011 to June 12, 2018 | 27 | $2,185,121.00 |
| PRC Manufacturer-2 | August 10, 2017 to September 20, 2018 | 10 | $522,082.50 |
| PRC Manufacturer-6 | November 26, 2010 to June 21, 2013 | 12 | $121,580.00 |
| PRC Manufacturer-3 | July 14, 2016 to February 7, 2019 | 8 | $114,694.00 |

48.     Notably, these records reveal that AVENTURA was importing security equipment from PRC Manufacturer-1 while JACK CABASSO was complaining to GSA in November 2016 about other contractors' supposed dealings with PRC Manufacturer-1 and the "significant cybersecurity issues" that could result.   For example, bank records show that AVENTURA wired funds to PRC Manufacturer-1 in the PRC on or about October 31, 2016 and November 29, 2016.   And law enforcement records show that on or about December 13, 2016, AVENTURA imported from PRC Manufacturer-1 in PRC an approximately 1,800-pound shipment of goods manifested as "digital video."

49.     As detailed above, AVENTURA has purchased goods from numerous other PRC manufacturers and, according to CBP records, has received shipments from over 40 different PRC manufacturers of security equipment.   These include PRC Manufacturer-5, PRC Manufacturer-6 and PRC Manufacturer-7.   Manifest descriptions for these shipments have likewise included references to security and surveillance equipment, including: "INTELLIGENCE CAMERA," "MINI DOME CAMERA," "HIGH SPEED

DOME CAMERA," "SECURITY CAMERAS" and "PTZ NIGHT VISION CAMERA." AVENTURA's bank records similarly reflect numerous outgoing wires to the PRC manufacturers whose goods it receives.

      e.  *AVENTURA Imports PRC-Made Cameras Without Required Country of Origin Markings and with False "Made in USA" Origin Markings*

     50.    Federal law that requires that "every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."   19 U.S.C. § 1304; see also 19 C.F.R. § 134.11.   Under CBP regulations, if "the words 'United States,' or 'American,' the letters 'U.S.A.,' any variation of such words or letters, or the name of any city or location in the United States . . . appear on an imported article or its container, and those words, letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article," the importer is required to "legibly and permanently" mark the product or container "in close proximity to such words, letters or name," with "the name of the country of origin preceded by 'Made in,' 'Product of,' or other words of similar meaning."   19 C.F.R. § 134.46.

     51.    CBP officers, assisted by other federal agents, have conducted border inspections of numerous international shipments to AVENTURA, including numerous air freight shipments to AVENTURA through JFK Airport.   Those inspections have revealed that AVENTURA regularly receives shipments of finished security equipment from various

PRC manufacturers that AVENTURA subsequently resells to U.S. government and private-sector buyers as American-made.

52.     For example, on or about May 1, 2017, CBP officers conducted a border inspection at a customs warehouse in Jamaica, Queens of a 98-piece, approximately 3,424-pound shipment to AVENTURA from PRC Manufacturer-7 in Shenzhen, PRC, that was manifested as "Camera."   The inspection revealed two types of "dome" style surveillance cameras and two types of "bullet" style surveillance cameras.   The packaging for each individual camera was marked with AVENTURA's logo and name, carried AVENTURA's corporate address in Commack, New York, and bore an image of the American flag.   The exterior shipping boxes that contained the units carried labels stating "Made in China," but many of the individual cameras and the packaging around the individual cameras bore hologram stickers with AVENTURA's logo and the words "MADE IN USA."   Moreover, the model numbers on three of the four models of cameras found during the inspection were identical to the model numbers of cameras offered for sale on AVENTURA's GSA Schedule price list.   Attached as Exhibit D to this Complaint are some of the photographs taken during the border inspection.

### f. *Examples of AVENTURA's Fraudulent Sales of PRC-Made Equipment to U.S. Government Agencies*

#### i. *AVENTURA Sells Body Cameras from the PRC to the Air Force*

53.     On or about May 17, 2018, the U.S. Air Force contracted AVENTURA to supply 25 body cameras for use by Air Force security personnel at an Air Force base. The contract required AVENTURA to comply with the BAA.

54.     On or about August 15, 2018, an Air Force service member observed Chinese characters on the built-in screen of one of the AVENTURA-supplied body cameras. The body camera was sent to a specialist for technical analysis.

55.     A specialist downloaded the camera's firmware and found numerous indications that the camera was manufactured in PRC.   Specifically, the specialist found that the camera contained multiple preloaded images that were apparently designed to display on the camera's built-in screen.   One such image was the U.S. Air Force logo; another was the logo of the PRC Ministry of Public Security, the PRC's principal domestic security agency.   A third image was the logo of PRC Manufacturer-1.   The specialist determined that all three logos had been saved to the camera's firmware using the same software, on a computer that was set to a time zone in the PRC—indicating that the camera's manufacturer in the PRC had been aware that the U.S. Air Force was the intended end user of the camera.   Attached as Exhibit E to this Complaint are some of the images recovered during the technical analysis of the body camera.

#### ii. *AVENTURA Sells Network-Linked Turnstiles from the PRC to the U.S. Department of Energy*

56.     On or about September 21, 2018, the U.S. Department of Energy ("DOE") awarded AVENTURA a contract worth $156,872 for six automated network-linked

turnstiles and a glass partition wall, to be installed at a DOE facility in Tennessee (the "DOE Contract").    AVENTURA's GSA price list represented that the turnstiles were made in the United States, and LAVONNE LAZARUS certified AVENTURA's compliance with the Buy American Act in connection with the purchase.    In AVENTURA'S bid for the DOE Contract, LAVONNE LAZARUS described AVENTURA as "the industry's only 'single-source' manufacturer" and proclaimed that "we proudly manufacture in the U.S.A."

57.    On or about January 15, 2019, CBP officers, assisted by other members of the investigative team, inspected a shipment to AVENTURA from Zhejiang in the PRC that was labeled "Turnstile, Walk through Metal Inspection, Speed Gate and Bollards."    The shipment consisted of large wooden crates labeled for delivery to AVENTURA that were found to contain multiple heavy-duty turnstiles pre-marked with the AVENTURA logo. Stuck to the protective acrylic that was, in turn, affixed to on one of the turnstiles was a printed note written in Chinese characters.    The CBP officers and agents surreptitiously marked four of the turnstiles for later identification in a way that would not be visible to casual observers.

58.    On or about February 22, 2019 and February 25, 2019, at DOE's Tennessee facility, special agents with DOE-OIG opened a shipment from AVENTURA that was sent pursuant to the DOE Contract.    The crates appeared identical to those which the CBP team had inspected on January 15, 2019, except that the shipping labels directing the crates to AVENTURA had been peeled off, leaving behind visible traces of paper and glue. Inside the crates, the agents found the same items that had been inspected by the CBP team on January 15, 2019, bearing the surreptitious markings that the CBP team had applied.

59.     On or about May 15, 2019, a special agent with DOE-OIG placed a call to LAVONNE LAZARUS regarding the turnstile shipment.     During the call, LAVONNE LAZARUS falsely stated that the turnstiles were "U.S. made [in] New York."     In addition, LAVONNE LAZARUS falsely claimed that the Chinese-language note on the turnstile related solely to the acrylic, which LAVONNE LAZARUS claimed had been separately purchased from China in large sheets, which AVENTURA then "cut[], mount[ed], and polishe[d] . . . in New York."

          iii.   *AVENTURA Sells Night-Vision Cameras from the PRC to the U.S. Navy*

60.     On or about March 15, 2019, the U.S. Navy ordered from AVENTURA a laser-augmented infrared night vision camera (the "Night Vision Camera"), among other items.     The Night Vision Camera, which cost approximately $13,500, was ordered pursuant to a task order under AVENTURA's GSA Schedule contract.     AVENTURA's GSA price list specified that the Night Vision Camera was manufactured in the United States of America.

61.     On or about April 30, 2019, CBP officers, assisted by other law enforcement agents, inspected a shipment to AVENTURA from a PRC manufacturer ("PRC Manufacturer-3") in Shenzhen, PRC, that arrived in the United States at JFK Airport.     The shipment contained, among other items, a night vision camera matching the specifications of the Night Vision Camera ordered by the Navy.     The CBP team surreptitiously marked the camera for later identification in a way that would not be visible to casual observers.

62.     On or about May 15, 2019, a shipment from AVENTURA was delivered to U.S. Naval Submarine Base New London in Groton, Connecticut.     The

shipment contained, among other items, the Night Vision Camera, bearing the surreptitious markings that had been applied by the CBP-led team at the border.   The Night Vision Camera was in substantially the same condition as it was when it was inspected by CBP at the border.

> g.   *The Defendants' Efforts to Conceal the True Origin of AVENTURA's Products from AVENTURA's Customers*

63.   During the charged period, AVENTURA employees regularly communicated with each other and with PRC manufacturers in furtherance of the scheme to conceal the true origin of AVENTURA's products from AVENTURA's customers.

64.   AVENTURA employees' emails demonstrate the scope of the defendants' fraudulent scheme to conceal the PRC origin of AVENTURA's products.   For example, on or about and between February 9, 2014 and February 21, 2014, JACK CABASSO and JONATHAN LASKER, among other AVENTURA employees, exchanged a series of emails with an employee of PRC Manufacturer Subsidiary-1 about modifying the firmware of PRC Manufacturer-1's cameras so that third-party video management software (often abbreviated as "VMS") would "recognize" the cameras as devices manufactured by AVENTURA, rather than as devices manufactured by PRC Manufacturer-1.   The employee of PRC Manufacturer Subsidiary-1 promised that PRC Manufacturer-1 would "start customizing a[] unique firmware for Aventura which including [sic] converting manufacturer information in different areas of our firmware from [PRC Manufacturer-1] to Aventura. And we can test this firmware together with different major VMS . . . to see if it will still recognize the camera as [PRC Manufacturer-1]."   The employee further promised that users would not "discover this as a [PRC Manufacturer-1] camera."

65.     On or about and between November 21 and November 29, 2018, JACK CABASSO exchanged emails with an employee of PRC Manufacturer-2, who was emailing from a PRC-based (".cn") domain and listed PRC landline and mobile numbers in her email signature.   In these exchanges, JACK CABASSO confirmed that the PRC Manufacturer-2 employee had signed a nondisclosure agreement and then wrote: "we sat this week and went over most of the things that need to happen to hide [PRC Manufacturer-2].   Michael and Al are putting together a list."   Based on my review of the email exchange, including later emails described below, as well as information learned during the course of the investigation, I believe the reference to "Al" to refer to ALAN SCHWARTZ.   JONATHAN LASKER was copied on that and all subsequent communications in the email chain.

66.     One week later, on or about November 29, 2018, JACK CABASSO responded to an email in the same email chain from a PRC Manufacturer-2 employee asking for AVENTURA's "OEM request list":

> We are evaluating the changes required to be made for it to be an OEM so they cannot trace to [PRC Manufacturer-2]. The housings are a problem since you publish them on your website but nothing we can do about that. As far as the other items we will provide a list. But the biggest problem is the one that hurt [PRC Manufacturer-1] as all their boards had markings DS-XXX so anyone opened the camera they know it's [PRC Manufacturer-1]. You have same problem as customers opened the camera and saw [PRC Manufacturer-2's Initials]. So we already lost several potential customers because of this.

Based on the investigation, I am aware that the term "OEM" is an acronym for "original equipment manufacturer," and generally refers to the items that have been manufactured by a different company for the purchaser to sell under its own brand name.

67.     The PRC Manufacturer-2 employee responded to JACK CABASSO that "we have asked our team to remove all [PRC Manufacturer-2 initials] on the PCB

[printed circuit board] for any new products.   And for the exsiting [sic] models, we can also

remove [PRC Manufacturer-2's Initials] if required by you."   JACK CABASSO replied:

"we started testing some of the shipments in our lab and found some dead out of the box.

Alan will explain what we found."   In the same response, JACK CABASSO copied ALAN

SCHWARTZ into the email chain.   Accordingly, I believe that "Alan" refers to

SCHWARTZ.

   68. In the same email chain, on or about December 1, 2018, ALAN

SCHWARTZ emailed the PRC Manufacturer-2 employee describing technical problems

with PRC Manufacturer-2's cameras.   SCHWARTZ also attached photographs of dome-

style surveillance cameras bearing AVENTURA's logo with condensation visible in the

cameras' interior.   In a later response, on or about December 4, 2018, a PRC Manufacturer-

2 employee asked SCHWARTZ to ship the defective cameras back to PRC Manufacturer-2,

and provided an address in Guangdong Province in the PRC.

   69. As another example, on or about December 17, 2018, JACK

CABASSO and WAYNE MARINO exchanged emails with employees of PRC

Manufacturer-4.   MARINO complained to the PRC Manufacturer-4 employees that

"communication from the server to the client contains [PRC Manufacturer-4's name] visible

in clear text.   This should be changed."   When the PRC Manufacturer-4 employee wrote

that this could not be changed, JACK CABASSO responded: "WE CANNOT HAVE

CUSTOMERS ABLE TO SEE [PRC MANUFACTURER-4'S NAME]," later adding: "we

also sent a sample to a customer and he found [PRC Manufacturer-4] . . . branding in the

[operating system] which is a problem."   ALAN SCHWARTZ and JONATHAN LASKER,

among others, were included on these communications.   On or about December 11, 2018,

ALAN SCHWARTZ assigned another AVENTURA employee a task in AVENTURA's work management system: "Remove all references to [PRC Manufacturer-4] in program."

70.     Also in December 2018, ALAN SCHWARTZ sold five PRC Manufacturer-1 networked video recorders to a client in Dubai, which SCHWARTZ asked a PRC Manufacturer Subsidiary-1 employee to brand with AVENTURA's part number and logo rather than PRC Manufacturer-1's own.   The PRC Manufacturer Subsidiary-1 employee responded that due to the small size of the order, "we can only offer [a] neutral version (without brand)."   SCHWARTZ agreed and asked the PRC Manufacturer Subsidiary-1 employee to "ship direct to Dubai from your factory."

IV.   <u>The Scheme to Fraudulently Obtain Contracts Set Aside for Women-Owned Businesses</u>

71.     In addition to its misrepresentations to government and private-sector customers around the world, AVENTURA, together with JACK CABASSO, FRANCES CABASSO, JONATHAN LASKER and LAVONNE LAZARUS also defrauded the U.S. government by obtaining contracts set aside for WOSBs under the false pretense that AVENTURA is controlled by FRANCES CABASSO, when in fact the company is controlled by JACK CABASSO.

a.   *Background Regarding Set-Asides for WOSBs*

72.     The FAR aims to provide "maximum practicable opportunities" to WOSBs and other small businesses to win government contracts.   <u>See</u> 48 C.F.R. § 19.201. The primary tool for achieving this goal is the "set-aside," a practice of restricting competition for a given contract to a designated category of bidders (for example, WOSBs). <u>See</u> 15 U.S.C. § 637(m) (providing that federal contracting officers may engage in set-

asides).   The FAR provides that most federal contracts between $3,500 and $150,000 are to be set aside for small businesses, and contracts over $150,000 must also be set aside if two or more bidders are small businesses and the resultant price will be a fair one.   See 48 C.F.R. § 19-502-2(a).

73.   The GSA and the Department of Defense ("DOD") have each set a goal of awarding 5% of their contracts by value to WOSBs.   In Fiscal Year 2017, DOD awarded 4.15% of its contracts to WOSBs, and GSA awarded 8.66% of its contracts to WOSBs in Fiscal Year 2018.

74.   A small business is eligible for WOSB set-asides if it is "owned and controlled by women," meaning that it meets the following requirements: "(1) at least 51 percent of [the small business] is owned by one or more women," and (2) "the management and daily business operations of the business are controlled by one or more women."   15 U.S.C. § 632(n).

75.   In order for a business to be "controlled" by women, "both the long-term decision making and the day-to-day management of the business operations must be conducted by one or more women[.]"   13 C.F.R. § 127.202(a).   The women managing the business "must manage it on a full-time basis," and "may not engage in outside employment" that draws their time and attention away from the woman-owned business.   Id. § 127.202(c).   Furthermore, "no males . . . may exercise actual control or have the power to control" the business.   Id. § 127.202(g).

   *b. AVENTURA Holds Itself Out as a WOSB*

76.   AVENTURA's page on the GSA Advantage website identifies AVENTURA as a woman-owned business, as does AVENTURA's own website.

AVENTURA employees have frequently repeated that claim in communications to government procurement officers.

77.     Beginning no later than June 27, 2011, LAVONNE LAZARUS and FRANCES CABASSO repeatedly sent emails to GSA employees representing that AVENTURA was a WOSB.

78.     For example, on or about April 22, 2013, LAVONNE LAZARUS sent a GSA representative a copy of a certificate that supposedly authenticated AVENTURA as a woman-owned business.   And on or about January 13, 2014, a GSA employee emailed FRANCES CABASSO to say that she (the GSA employee) was processing a possible five-year extension of AVENTURA's GSA Schedule contract, and wanted to "verify if Aventura Technologies, Inc. is a Woman-Owned business."   FRANCES CABASSO replied: "Yes we are still a certified women-owned business."   The GSA employee replied that the extension would be completed that day.

79.     LAVONNE LAZARUS's annual certifications of compliance to GSA each include a certification that AVENTURA is a WOSB.

80.     AVENTURA won contracts from procurement officers who believed that it was a WOSB.   For example, on or about December 11, 2008, the U.S. Navy contracted with AVENTURA to provide a DVR system for Joint Base Pearl Harbor-Hickam. The award document noted that AVENTURA was a WOSB.

   c.  *AVENTURA Is Controlled by JACK CABASSO*

81.     AVENTURA's claim of WOSB status is false.   AVENTURA is, in fact, controlled by JACK CABASSO; FRANCES CABASSO plays no role in managing

AVENTURA and little or no role at the company in any capacity; and FRANCES CABASSO is employed at an unrelated company as a bookkeeper.

82.    Both Individual-1 and Individual-2 told the FBI that JACK CABASSO was in charge of AVENTURA.   Neither individual mentioned FRANCES CABASSO.

83.    On or about May 10, 2018, JACK CABASSO was deposed by a lawyer for a client whom AVENTURA had sued in federal court.   In that deposition, JACK CABASSO stated under oath that he had held the title of Managing Director at AVENTURA since the company's inception, and that his job responsibilities were to "oversee all operations of the company."

84.    On or about August 28, 2017, JACK CABASSO wrote an email to an U.S. Air Force procurement officer, stating in part: "I am the Managing Director of Aventura Technologies and the senior most person within the organization."

85.    GSA representatives last conducted an in-person visit to AVENTURA's offices on or about October 29, 2013.   On that occasion, JACK CABASSO was present and FRANCES CABASSO was not.

86.    On or about December 14, 2017, the Security Industry Association, a trade group, published an interview with JACK CABASSO on its website to mark the occasion of AVENTURA joining the group.   The interview, which was in question-and-answer format, included the question: "Who are the prominent executives at your company? If someone wanted to meet a key person at an industry networking event, who would that be?"   As reported, JACK CABASSO's named two male individuals in response.   JACK CABASSO did not name FRANCES CABASSO.

87. Moreover, there is reason to believe that messages sent to FRANCES CABASSO's AVENTURA email account were accessible from JACK CABASSO's email account, and that JACK CABASSO used this access to pose as FRANCES CABASSO in communications with the GSA. Records obtained from AVENTURA's previous email provider reveal that FRANCES CABASSO's email address was configured to auto-forward emails received at that address to JACK CABASSO's email address, as well as to JONATHAN LASKER's email address. For example, on or about September 29, 2015, a GSA employee sent an email to FRANCES CABASSO's email address, with no copied recipients. The reply came from JACK CABASSO's email address, but was signed "Frances." On multiple other occasions, emails sent to JACK CABASSO's email address received a response from FRANCES CABASSO's email address.

88. Finally, FRANCES CABASSO is currently employed by a Long Island accounting firm ("Accounting Firm-1") and was previously employed by a different accounting firm that was acquired by Accounting Firm-1 ("Accounting Firm-2"). Until it was acquired by Accounting Firm-1, Accounting Firm-2's website included a list of personnel that stated: "Fran Cabasso, MBA, Staff Accountant, has been with the firm since 2006. She handles a variety of accounting services including tax return preparation and sales and payroll tax returns." FRANCES CABASSO reported income as an employee of Accounting Firm-2 on her federal and New York State tax returns. Bank records reveal that FRANCES CABASSO received regular direct deposits from Accounting Firm-2, and had been receiving such deposits since at least July 2011.

89. Agents performed surveillance at Accounting Firm-2's business location on dozens of occasions between August 2018 and July 2019. FRANCES

CABASSO's vehicle was parked in the parking lot of Accounting Firm-2 on the majority of those occasions.

90.     In internal communications, the defendants acknowledged that FRANCES CABASSO did not work at AVENTURA.   For example, in an instant message exchange on or about December 5, 2016 between JACK CABASSO and LAVONNE LAZARUS, both defendants discussed moving another employee into "Fran's office"--the office of the purported owner of the company—putting the word "Fran's" in quotation marks.

V.   The Money Laundering Scheme

91.     Finally, the government's investigation has revealed evidence that JACK CABASSO and FRANCES CABASSO have been siphoning cash out of AVENTURA, which constituted proceeds of the scheme to misrepresent the country of origin and true manufacturers of products sold by AVENTURA, as well as the scheme to misrepresent AVENTURA as a WOSB, as detailed above, in an apparent effort to conceal the extent to which they were personally profiting from those schemes.

92.     Specifically, between May 24, 2016 and August 21, 2018, AVENTURA transferred approximately $2.8 million to an attorney escrow account belonging to a Long Island, New York-based law firm ("Law Firm-1").   A New York limited liability company and corporation owned by FRANCES CABASSO ("LLC-1"), also paid approximately $348,000 into the same account on or about February 25, 2015.   LLC-1 owns AVENTURA's headquarters building.

93.     In turn, numerous payments were made by Law Firm-1 to FRANCES CABASSO and/or for the benefit of her relatives.   Among these were the following:

a. On or about May 24, 2016, AVENTURA paid $450,000 by wire transfer to Law Firm-1.   On that same date, Law Firm-1 wired approximately $392,000 to Wells Fargo Home Mortgage, with the reference note "Cabasso," and paid approximately $43,000 by check, with the reference note "Cabasso," to two individuals who share a surname and appear to be married ("Couple-1").   An adult child of JACK CABASSO and FRANCES CABASSO ("Child-1") owns a home in East Northport, New York that was purchased on or about May 27, 2016 for $485,000 from Couple-1.   Thus, all or nearly all of AVENTURA's $450,000 payment to Law Firm-1 appears to have been used to fund Child-1's home purchase.

b. In early 2018, $675,000 in AVENTURA corporate funds were lent to a home buyer using Law Firm-1 as a conduit.   When the loan was paid off, FRANCES CABASSO received both the interest and the principal into her own bank account.   The details of the transaction are as follows:

   i. AVENTURA wired $675,000 to Law Firm-1 on or about January 19, 2018.   Five days later, on or about January 24, 2018, Law Firm-1 paid $628,002 to a resident of Queens, New York ("Individual-3").   Public records indicate that on that same date—January 24, 2018—Individual-3 sold an apartment in Maspeth, New York to a different LLC ("LLC-2").

   ii. On or about April 3, 2018, LLC-2 wired $682,545.28 to Law Firm-1, with the comment "Cabasso Pay Off."   The next day, Law Firm-1

wired all but $600 of that sum to FRANCES CABASSO, with the
comment "[] Loan."

c. In addition to the $675,000 transaction described above, Law Firm-1's escrow
account made at least $189,000 in other payments to FRANCES CABASSO in
or about and between 2017 to 2018, often with comments indicating that the
funds reflected interest payments on mortgage loans for New York City
properties with respect to which FRANCES CABASSO had acted as lender.
These payments sometimes contained references to a limited liability company
owned by a Maspeth-based realtor ("LLC-3").

d. LLC-2 and LLC-3 paid FRANCES CABASSO approximately $286,311
during 2017 and 2018.

94.     FRANCES CABASSO owns both LLC-1 and a second New York
limited liability company ("LLC-4").   LLC-4 has served as a conduit for round-trip
payments from and to AVENTURA that appear to lack any legitimate business purpose.
LLC-1 has been used to extract cash from AVENTURA and send it to FRANCES
CABASSO and Cabasso family investments without any relationship to AVENTURA
corporate business.

95.     Specifically, on or about July 28, 2010, AVENTURA paid LLC-4
$500,000.   Five months later, LLC-4 transferred $350,000 of that total back to
AVENTURA, paying the rest to JACK CABASSO's legal bills.   Similarly, on or about
August 29, 2013, AVENTURA paid LLC-4 $250,000 from one of AVENTURA's bank
accounts.   That same day, LLC-4 paid that entire sum to another of AVENTURA's
accounts.

96.     Between approximately 2015 and 2018, AVENTURA paid approximately $1.55 million to LLC-1.   In turn, LLC-1 paid $385,000 to FRANCES CABASSO over the same period, and paid $348,000 to Law Firm-1 on or about February 25, 2015.   AVENTURA also paid $404,000 between May 2017 and July 2018 to yet another entity owned by FRANCES CABASSO ("Company-1").

97.     In addition to the transactions described above, JACK CABASSO and FRANCES CABASSO appear to have used AVENTURA's corporate funds to purchase and maintain a yacht, named the *Tranquilo*, which they use for pleasure cruising and purportedly to operate a yacht charter business.   A photograph of the yacht is attached to this Complaint as Exhibit F.

98.     Since 2013, AVENTURA has paid approximately $1,000,000 in yacht-related fees, including a $744,043 payment to a Florida-based yacht company in 2013, and payments to marinas and yacht servicing companies in New York, Aruba and Florida. However, AVENTURA's public-facing websites do not advertise yacht chartering services, or any other line of business requiring a watercraft.

99.     On or about August 3, 2015, a Connecticut-based local news website published a report about a boating accident aboard the *Tranquilo*, in which two 13-year-old girls were critically injured.   The article identified JACK CABASSO as the owner of the *Tranquilo* and stated that he had been piloting the *Tranquilo* at the time of the accident.   In or about October 2019, law enforcement agents conducting surveillance observed the *Tranquilo* docked at a private marina in the same gated community where JACK CABASSO and FRANCES CABASSO reside.

100.    The *Tranquilo* is advertised for rent on a vacation rental website, as well as on its own website, "1foryachts.com."    Text on 1foryachts.com indicates that 1foryachts.com is the website of a separate company purportedly owned by FRANCES CABASSO.    The listed contact for the *Tranquilo* on the vacation rental website is JACK CABASSO.    Records provided by the vacation rental website and its payment processor indicate that the designated bank account for remittal of rental payments for the *Tranquilo* is held in the name of one of JACK CABASSO and FRANCES CABASSO's sons.

WHEREFORE, your deponent respectfully requests that arrest warrants issue for the defendants JACK CABASSO, FRANCES CABASSO, JONATHAN LASKER, LAVONNE LAZARUS, WAYNE MARINO, EDUARD MATULIK, ALAN SCHWARTZ, and a summons issue for defendant AVENTURA TECHNOLOGIES, INC., so that they may be dealt with according to law.    I further request that this affidavit, and the arrest warrants and summons be filed under seal as premature disclosure of this application would give the defendants an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates and flee or evade prosecution.

CLAUDIO LIPCIC
Special Agent
Federal Bureau of Investigation

Sworn to before me this
6 day of November, 2019

A/ Scanlon

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT A

| | |
|---|---|
| **To:** | ███████████████████████ @gsa.gov>] |
| **From:** | Jack Cabasso |
| **Sent:** | Wed 11/23/2016 5:07:06 PM |
| **Subject:** | Schedule 84 Non TAA and Cyber Threats |
| ████ ███ | Removed From US Embassy Report for J Cabasso.pdf |

██ █

Just as a heads up – I know we discussed it at the ASIS show but there is a big problem with Schedule 84 vendors listing products from a company that is actually the Communist Chinese Government and has "significant" cybersecurity issues aside from TAA compliance and has a lot of publicity.  So as far as TAA it doesn't get any worse.  The company is called █████ ██████ does not dispute that their products are in fact made in China – the problem is the GSA vendors who are listing it as Made in USA.

There is actually a bid out for their product now on GSA.
https://www.gsaadvantage.gov/advantage/catalog/product_detail.do?gsin=11000044377299

Vendors list it as ██████ or ████████ and it is all the same.  ██████ will acknowledge they manufacture no products outside of China.

https://www.gsaadvantage.gov/advantage/s/search.do?db=0&q=0:2████████&searchType=0&p=2

Schedule 84 Vendors that list ██████ product and the number of products is listed below:



https://www.gsaadvantage.gov/advantage/s/vnd.do?q=0:2██████&db=0&searchType=0&listFor=All

http://www.voanews.com/a/██████-surveillance-cameras-us-embassy-kabuk/3605715.html

http://www.americanthinker.com/articles/2016/09/us_kabul_embassy_buying_chinese_security_cameras.html

**Jack S. Cabasso, Managing Director**
**Aventura Technologies Inc.**
48 Mall Drive
Commack, New York 11725 USA

Phone ████████████████
Cell: ██████████
Skype: ████████

mailto ██████████████████

Website:  www.aventuracctv.com

GSA Schedule: GS-07F-0391V

# EXHIBIT B

We go to another enormous manufacturing floor – this one is dedicated to IP cameras. There are 21 product lines in here and it's really buzzing. I've seen camera manufacturing lines before but nothing remotely like this. Standing there, drinking the scene in, it occurs to me that this room is the vibrant, clattering heart of ███████ titanic accomplishment.



This area is running a single 8-10 hour shift and has a daily capacity of 18,000 IP cameras. The lines are building fixed domes, box cameras, transport cameras, bullet cameras and more. There's a lot of assembly work with cameras – the lenses, housings, dome bubbles, terminations and all the rest have to be hand-built.

# EXHIBIT C

# The Company
## Who We Are

### Headquartered in New York, USA

Since 1999 Aventura Technologies, Inc. has developed a reputation for being an innovative U.S. based designer, developer, and manufacturer of advanced hardware and software products and peripheral solutions for government, military, enterprise and commercial.

The Company is a true "single-source" manufacturer providing end-to-end hardware and software solutions, which can also inter-operate seamlessly with a myriad of third-party products.

First and foremost, Aventura is a solution provider and we proudly manufacturer in the U.S.A. Supported by logistics and support offices worldwide.

Aventura works closely with its technology and integration partners from the design-consulting phase through implementation, integration, and life-cycle support. Our solutions can be seen from local commercial operations to sensitive government and military locations around the world.

Aventura's philosophical perspective is education is paramount and adopts the view of high levels of training and technology transfer. A knowledgeable customer is our most valuable asset and mitigates the risk.


Made In The U.S.A.



### Technology Pioneer
Aventura has always been a technology leader first introducing H.264 to the security industry back in 2003 and following with H.265 in 2013. Aventura's research and development teams have garnered a number of industry firsts in hardware, software and solutions.

### Solution Provider
Aventura is the industry's only organization, which in addition to off-the-shelf offerings – customizes security and safety solutions to meet specific customer requirements.

### Markets
Aventura has expertise and serves a diverse range of vertical markets: government, military, law enforcement, transportation, critical infrastructure, homeland defense, education, hospitality, healthcare, gaming and commercial.

### Aventura is an IT Company
Security has evolved over the last decade from a simple, independent analog black-box world, to highly sophisticated IT-based enterprise solutions with advanced interoperability.

The rapid transitioning has left many legacy providers with limited ability to keep pace. Aventura is and has been a true "IT" company from its inception and is a fabric of the corporate culture. We are dedicated to solutions that are architected with the future in mind and an emphasis on security both from a cyber and product perspective.

AventuraSecurity.com   Copyright © 2000-2016 Aventura Technologies, Inc. All Rights Reserved.          2

# EXHIBIT D

RoHS  FC  CE  ↑  ⊤  ♺  ♉

MODEL:
**CAM-IPS-2D-212V-IRVP**
PRODUCT:
**2MP VP MINI DOME IR CAMERA**
LENS: **2.8-12mm**   POWER DC12V/POE
FIRMWARE: **V.7.5.61.10**
PRODUCTION DATE: 04282017
MAC: **A875E2034A97**

S/N: 170300720240



6600222447

**Aventura**

Aventura Technologies, Inc.
48 Mall Drive
Commack, New York 11725 USA
www.aventuracctv.com
TM and ©2016 Aventura Technologies, Inc. All rights reserved





USA
C/NO:96
MADE IN CHINA

Aventura Technologies

# EXHIBIT E





# EXHIBIT F

