

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RMT:ICR/AFM/KCB
F. #2018R01047

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 7, 2019

By Hand

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Jack Cabasso
                Docket No. 19-MJ-1035 (RER)

Dear Judge Reyes:

      The government respectfully submits this letter memorandum in support of its application to detain the defendant Jack Cabasso pending trial. As set forth in the complaint unsealed today, Cabasso masterminded a 13-year international fraud conspiracy in which he sold Chinese-made security equipment with known cyber-vulnerabilities to U.S. military, government and private-sector customers while falsely representing that the company he runs, Aventura Technologies, Inc. ("Aventura"), was manufacturing that equipment in the United States.

      Cabasso has profited handsomely through his lies: Aventura has made more than $88 million since November 2010. Because of Cabasso's use of shell companies, real estate transactions on behalf of third-party beneficiaries, and other money laundering techniques aimed at obfuscation and concealment, the government does not have a comprehensive understanding of the nature and location of all Cabasso's financial assets. Indeed, and despite authorities having seized as of this morning more than $3 million along with Cabasso's 70-foot luxury yacht, there is good cause to believe that Cabasso has significant offshore assets, as well as ties to jurisdictions from which extradition is practically impossible, including the People's Republic of China ("PRC").

      Given the highly lucrative, far-reaching, and international nature of Cabasso's fraud scheme, together with the overwhelming evidence against him and the significant prison term he faces if convicted, Cabasso is a serious risk of flight. This risk is compounded by the fact that Cabasso was previously convicted of jury tampering in the Eastern District of New York, demonstrating that he has little respect for the law or judicial

supervision. Taking these facts together, the government respectfully submits that no conditions of pre-trial release could secure Cabasso's return to court. Accordingly, he should be detained pending trial.

I.      The Defendant's Criminal Scheme

As set forth in greater detail in the complaint, which is appended hereto for the Court's convenience, this case arises from a long-term investigation into Cabasso, Aventura, and all of Aventura's senior management. For more than a decade, Aventura held itself out as an American security electronics manufacturer headquartered in Commack, New York. In fact, Aventura does not manufacture anything in the United States. Instead, since 2006 if not earlier, Aventura has been importing electronics and surveillance equipment primarily from the PRC and then reselling that equipment, purportedly as American-made, at a higher price. The harm to Aventura's victims was not merely that they overpaid for Chinese equipment; Cabasso's scheme resulted in his customers – including the U.S. Army, U.S. Navy and U.S. Air Force – unwittingly incorporating electronics with serious cybersecurity risks into their security networks.

In a parallel scheme, Cabasso and his wife, co-defendant Frances Cabasso, falsely represented on numerous occasions that Frances Cabasso was the chief executive of Aventura. In fact, Frances Cabasso was in charge only on paper; the true chief executive officer of Aventura was Jack Cabasso. (Indeed, Frances Cabasso works part-time at a Long Island accounting firm.) This misrepresentation gave Aventura access to government contracts that were set aside for women-owned small businesses, a category that is legally defined to include only those businesses owned by women where management and daily operations are also controlled by one or more women.

Aventura and Cabasso, specifically, profited enormously from these frauds. Since November 2010, Aventura's revenues have exceeded more than $88 million, including more $20 million from federal government contracts. In an apparent effort to conceal these illicit profits and obfuscate the whereabouts of his criminally obtained assets, Cabasso siphoned money out of Aventura through a network of shell companies and intermediaries. The funds were then directed to investments owned by the Cabassos, or controlled for their benefit.

For example, between 2016 and 2018, Aventura transferred approximately $2 million to an attorney escrow account belonging to a Long Island, New York-based law firm ("Law Firm-1"). In turn, Law Firm-1 paid $435,000 towards the purchase of a new home for a relative of Jack and Frances Cabasso in May 2016. Similarly, in early 2018, Aventura transferred $675,000 to Law Firm-1. Those funds were loaned out to a separate company for use in purchasing a house. When that company repaid the loan to Law Firm-1, the proceeds, totaling approximately $682,000, were transferred to Frances Cabasso.

In addition to the transactions through Law Firm-1, Aventura has transferred at least $2.75 million to shell companies owned by Frances Cabasso. Those funds were then

2

transferred to a number of accounts, including Frances Cabasso's personal bank account and the business account of a lawyer retained by Jack Cabasso.

In addition to these and other transfers, Aventura has made approximately $1 million in payments since 2013 related to the Cabassos' 70-foot luxury yacht, known as the *Tranquilo*, which is moored in the same gated community as the Cabassos' home. The Cabassos used the *Tranquilo* for pleasure cruising, and rented it out for income. Although Aventura is the supposed owner of the *Tranquilo*, the yacht appears to have no connection with Aventura's corporate business and its income flows to the Cabassos, not to Aventura.

Simultaneous to the arrest of the seven individual defendants, the U.S. Marshals Service seized 12 financial accounts belonging to Aventura and Frances and Jack Cabasso, including bank, brokerage and retirement accounts, containing assets totaling over $3 million.

II.  Applicable Law

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

Four factors guide the Court's determination of whether the defendant should be released on bail: (1) the nature and circumstances of the crimes charged; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant, including "financial resources, "past conduct" and "criminal history"; and (4) the seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d at 437 ("[The defendant] has twice been convicted of weapon possession--one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.  Argument

The complaint charges Jack Cabasso with conspiracy to commit wire and mail fraud, in violation of Title 18, Sections 1343, 1341 and 1349; unlawful importation of merchandise into the United States after misrepresenting the country of origin of that

3

merchandise, including security cameras, other networked surveillance cameras, automated turnstiles and related equipment, in violation of Title 18, Sections 545 and 2; and money laundering conspiracy, in violation of Title 18, Section 1956(h).

As set forth below, based on the nature and circumstances of the charged crimes, which were possible only through Cabasso's prolific lies, the overwhelming weight of the evidence, and the fact that Cabasso has significant international ties and a history of jury tampering and violating terms of court supervision, the government respectfully submits that there is no combination of conditions that could reasonably assure Cabasso's appearance in court.

### A.   The Nature and Circumstances of the Charged Crimes

The defendant's criminal conduct was extremely serious and broad in both temporal and geographic scope. Cabasso orchestrated a fraud that grossed more than $88 million and involved co-conspirators both in the United States and overseas, including in the PRC. His scheme required near-constant deception – countless material misrepresentations to U.S. military and U.S. government procurement officials, border authorities and private customers about the origins of the goods Aventura sold and who was running the company. Cabasso lied with skill and an apparent sense of impunity, always to advance his self-interest and often to the detriment of national security. The seriousness of his criminal conduct weighs in favor of detention, and the extent of Cabasso's deceit fatally undermines the credibility of any claim that he would return to court if released on bond.

### B.   The Weight of the Evidence

The weight of the evidence against Cabasso is overwhelming and includes, among other things, witness accounts, email and other electronic evidence, physical surveillance, financial analysis and physical evidence, as detailed above and at length in the complaint. Notably, much of the government's evidence against Cabasso comes from his own words—touting Aventura products as American-made, while simultaneously sending numerous emails to, among others, PRC manufacturers about the need to hide that Aventura's products were made in the PRC—not on Long Island.

As courts have observed, "[w]hen the evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be strong . . . a defendant has stronger motives to flee." United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015). Here, in light of the extent and sophistication of Cabasso's fraud, the government conservatively estimates that he faces an advisory Guidelines sentencing range of 168 to 210 months' imprisonment for the charged country-of-origin wire fraud scheme alone. See U.S.S.G. § 2B2.1(a)(1), (b)(1)(M), (b)(2)(A)(i), (b)(10)(B), (b)(10)(C).

Accordingly, the overwhelming nature of the evidence against Cabasso favors his detention because he has a strong motive and incentive to flee.

### C. The Defendant's History and Characteristics

#### 1. Criminal History

Cabasso has a lengthy criminal history, including numerous crimes involving deceit and efforts to interfere with judicial proceedings. He was convicted in 1992 of conspiring to influence a juror, in violation of 18 U.S.C. § 371. See United States v. Cabasso, et al., No. 92-CR-697 (ADS) (E.D.N.Y.) (the "1992 Case"). That conviction arose from Cabasso's attempt to influence a juror serving in a separate criminal case charging him with another wire fraud scheme. See United States v. Cabasso, et al., No. 91-CR-1234 (ADS) (E.D.N.Y.) (the "1991 Case"). Specifically, agents learned that one of Cabasso's associates (later a codefendant in the 1992 Case) had surveilled the location of one of the jurors empaneled in the 1991 Case. Another of Cabasso's associates (who also became his codefendant in the 1992 Case) called that juror repeatedly in order to influence her verdict. Cabasso recruited both of these associates to tamper with the juror. Then, on April 21, 1992, using a ruse of a UPS delivery to the juror, Cabasso's associates approached the juror and spoke to her about her position as a juror. The juror reported the incident to police because she felt intimidated. Two days later, the jury was unable to return a verdict as to Cabasso in the 1991 Case.

Cabasso was sentenced principally to 21 months' imprisonment and a three-year term of supervised release for his jury tampering conviction in the 1992 Case. One of Cabasso's conditions of supervised release was that he was prohibited from associating with other convicted felons. In 1995, within approximately three months of the completion of his term of imprisonment, Cabasso's probation officer saw him at a music concert with a woman who the probation officer subsequently learned was Cabasso's codefendant in the 1992 Case—one of the coconspirators who had helped Cabasso tamper with the jury. When confronted by his probation officer, Cabasso lied, claiming the woman was a secretary from his office.

Cabasso has also been convicted of several state crimes – all of which involve dishonesty. On April 30, 1982—when Cabasso was just 23 years old – he was convicted of two counts of grand larceny in the second degree, in violation of N.Y.P.L. § 155.35(1) for which he was sentenced to 50 days' imprisonment and 58 months' probation. Just a few years later, on December 6, 1985, Cabasso was convicted of attempted grand larceny in the second degree, in violation of N.Y.P.L. § 155.35(1) for which he was sentenced to five years' probation. Finally, in March 2000, Cabasso was convicted of, among other charges, enterprise corruption, in violation of N.Y.P.L. § 460.20, for his participation in a stock-fraud scheme that reportedly stole $176 million from 16,000 investors. As part of a plea deal, Cabasso received a 16-month-to-4-year sentence, and agreed to the forfeiture of approximately $1.5 million that he had secreted in foreign bank accounts.

In addition to the convictions above, in 2011 Cabasso was charged in this district with six counts of mail fraud for fraudulently using without permission the credit card of a business associate to pay for a Google advertising campaign that directed traffic to Aventura's website. See United States v. Jack Cabasso, No. 11-CR-493 (SJF) (E.D.N.Y.). Cabasso was acquitted of all six counts of mail fraud following a jury trial in 2012.

5

2.   Foreign Travel and Connections

Cabasso travels frequently, and regularly, to foreign countries including the PRC, where he has extensive business contacts and relationships. His money laundering activities have limited the government's ability to identify the locations of all his assets, making it probable that he has money overseas. Moreover, his past criminal conduct involved the secretion of proceeds of fraud in foreign bank accounts, further increasing the likelihood that Cabasso has the means to sustain himself if he were to flee the country.

3.   Diminished Financial Ties to the United States

Cabasso's financial ties to the United States have been greatly diminished by this prosecution. Today the U.S. Marshals Service served warrants seizing 12 different bank and investment accounts controlled by Cabasso, including Aventura's operating account, which, in total, held approximately $3 million in assets. It is unlikely, given the nature of the charges, the arrests of its management team, and the seizure of its bank accounts, that Aventura will continue as a going concern. The Marshals also seized a $700,000 pleasure yacht used by Cabasso that had been purchased using funds from Aventura's bank accounts that were the proceeds of the charged frauds.

IV.   Conclusion

In sum, the seriousness of Cabasso's criminal conduct, the strong proof of the fraud and money laundering schemes detailed in the Complaint, Cabasso's overseas ties, and his lengthy criminal history establish by a preponderance that he is a serious risk of flight. No combination of pre-trial release conditions can adequately mitigate this risk. Indeed, as the Second Circuit has observed in rejecting elaborate bail packages for defendants, even ones that include "home detention and electronic monitoring" are insufficient because they try to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." United States v. Millan 4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted). The same is true for defendants who pose risk of flight.

For these reasons, the government respectfully submits that no combination of pre-trial release condition can assure that the defendant returns to court. Accordingly, the government moves for a permanent order of detention against the defendant.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/
Ian C. Richardson
Alexander Mindlin
Kayla Bensing
Assistant U.S. Attorneys
718-254-6299/6433/6279

cc:   Clerk of Court (RER) (by ECF)
      Defense Counsel (by Hand)